W. West Allen, Esq.
Nevada Bar No. 5566
Jonathan W. Fountain, Esq.
Nevada Bar No. 10351
HOWARD & HOWARD ATTORNEYS PLLC
3800 Howard Hughes Parkway, Suite 1000
Las Vegas, Nevada 89169
Telephone: (702) 257-1483
Email: wwa@h2law.com
Email: jwf@h2law.com

John F. Bennett, Esq.
Will comply with LR IA 11-2 within 14 days
Paul J. Linden, Esq.
Will comply with LR IA 11-2 within 14 days
Aaron T. Brogdon, Esq.
Will comply with LR IA 11-2 within 14 days
Derek M. Freitas, Esq.
Will comply with LR IA 11-2 within 14 days
Nicholas R. Taylor, Esq.
Will comply with LR IA 11-2 within 14 days
Amy E. Mildebrath, Esq.
Will comply with LR IA 11-2 within 14 days
FBT GIBBONS LLP
301 East Fourth Street, Suite 3300
Cincinnati, Ohio 45202
Telephone: (513) 651-6423
Email: jbennett@fbtgibbons.com
Email: plinden@fbtgibbons.com
Email: abrogdon@fbtgibbons.com
Email: dfreitas@fbtgibbons.com
Email: ntaylor@fbtgibbons.com
Email: amildebrath@fbtgibbons.com

*Attorneys for Plaintiff, NRT Technologies, Inc.*

HOWARD & HOWARD ATTORNEYS PLLC

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| NRT TECHNOLOGIES, INC., a Nevada corporation,<br><br>Plaintiff<br><br>v.<br><br>TAVOLO TECH LLC, a Michigan limited liability company; OBJECT STUDIO LLC, a Texas limited liability company; RYAN MCCLELLAN, an individual; and STEVEN NAGATA, an individual,<br><br>Defendants. | Case No. 2:26-cv-02007<br><br>**COMPLAINT**<br><br>**(JURY DEMAND)** |

NRT Technologies, Inc. ("**NRT**"), for its complaint against Defendants Ryan McClellan ("**McClellan**"), Steven Nagata ("**Nagata**"), Object Studio LLC ("**Object Studio**"), and Tavolo Tech LLC ("**Tavolo**"), states as follows:

## SUMMARY AND NATURE OF THE ACTION

1. This action arises from a coordinated and unlawful scheme by a former business partner, a former high-level executive, and a hired contractor to misappropriate NRT's valuable intellectual property and trade secrets related to its innovative casino table game management platform—a system that combines proprietary hardware and software to deliver valuable analytics and consolidate multiple functions into a single intelligent device—to launch a competing enterprise. Each Defendant was bound by a separate, unambiguous contract to protect NRT's assets, yet each chose to violate its duties for its own enrichment.

2. First, Defendant Ryan McClellan, having sold his company and its intellectual property to NRT, flagrantly breached his perpetual contractual duty never to use or disclose the very trade secrets he sold to NRT. McClellan further breached his duties not to compete with NRT, not to solicit NRT customers, and not to solicit or interfere with NRT's contracts with its employees, consultants, agents, and/or contractors. Specifically, McClellan founded Defendant Tavolo to market and sell a product that was developed with technology that he sold to NRT, unlawfully disclosed and used NRT trade secrets to launch Tavolo, solicited NRT customers on behalf of Tavolo, and solicited Defendants Nagata and Object Studio to join his competing enterprise while they were subject to contractual arrangements with NRT.

3. Second, Defendant Steven Nagata, a former NRT Vice President entrusted with managing and developing proprietary technology, breached a binding employment agreement that obligated him to maintain the secrecy of NRT's confidential information in perpetuity and affirmed that all intellectual property he developed was the exclusive property of NRT. After he resigned, he began working for Defendant Object Studio to help build a competing product using the NRT intellectual property and trade secrets he was once paid to protect.

4. Third, Defendant Object Studio, a firm NRT hired to provide technology consulting and development services, breached both a professional services agreement and a non-disclosure

HOWARD & HOWARD ATTORNEYS PLLC

agreement. These agreements established that all work product it created was the "sole and exclusive property" of NRT and explicitly forbade Object Studio from using or transferring that intellectual property to any third party. In direct violation of this duty, Object Studio took the intellectual property and trade secrets it was paid to create for NRT and used them to build a competing product for Tavolo.

5. NRT thus brings this action to obtain damages and to permanently enjoin Defendants' unlawful conduct.

## PARTIES

6. Plaintiff NRT is a corporation organized under the laws of Nevada with its principal place of business in Las Vegas, Nevada. NRT is a global technology leader in the design and development of innovative hardware and software solutions for the casino and gaming industry.

7. Upon information and belief, Defendant McClellan is an individual residing in Grosse Pointe, Michigan.

8. Defendant McClellan is a former owner of VisuaLimits, LLC ("**VisuaLimits**"), and is the founder of Defendant Tavolo.

9. Upon information and belief, Defendant Nagata is an individual residing in Henderson, Clark County, Nevada. Defendant Nagata is the former Vice President of Table Game Solutions at NRT and, upon information and belief, now works for Defendant Object Studio as Chief Operating Officer.

10. Upon information and belief, Defendant Object Studio is a Texas limited liability company with its principal place of business in Frisco, Texas. Object Studio is a software development firm that worked closely with NRT.

11. Defendant Tavolo is a company organized under the laws of Michigan, founded and operated by Defendant McClellan, that is doing business in Clark County, Nevada. Defendant Tavolo directly competes with NRT by selling table game management systems.

12. Upon information and belief, Defendant Tavolo has marketed its products to casinos in Las Vegas and registered as an exhibitor at the October 6-9, 2025 Global Gaming Expo in Las Vegas to promote its products, including the products discussed below.

///

## JURISDICTION AND VENUE

13. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1367 (supplemental jurisdiction).

14. This Court also has personal jurisdiction over each of the Defendants.

15. Defendant McClellan, under the MIPA (defined below), agreed to the exercise of general personal jurisdiction over him by the Nevada courts with venue in Clark County, Nevada, as did Defendant Object Studio under the Object Studio NDA (defined below).

16. With respect to Defendant Nagata, the Court has general personal jurisdiction over him because he is a resident and domiciliary of Clark County, Nevada.

17. With respect to Defendants McClellan and Object Studio, in addition to their express consent to the exercise of general personal jurisdiction over them, the Court may exercise specific personal jurisdiction over them as well. They each purposefully availed themselves of the privilege of conducting business in Nevada by, among other things, entering into and performing under substantial, long-term contractual relationships with NRT, a Nevada-based corporation. The claims in this action for breach of contract and misappropriation arise directly from those Nevada-centric contracts and business relationships and the exercise of specific personal jurisdiction over them is otherwise reasonable.

18. This Court also has specific personal jurisdiction over all of the out-of-state Defendants *(i.e.*, Defendants McClellan, Object Studio, and Tavolo) because they each committed intentional torts—including trade secret misappropriation and civil conspiracy—that were expressly aimed at NRT, a corporation they knew to be headquartered in Nevada where they also knew the brunt of the injury arising from their tortious conduct would be felt, and the exercise of specific personal jurisdiction over them is otherwise reasonable. As alleged below, Defendants acted in concert as co-conspirators, and the in-forum acts of Defendant Nagata in furtherance of the conspiracy are attributable to all other Defendants for jurisdictional purposes.

19. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to this action occurred in this judicial district, and all Defendants are subject to the Court's personal jurisdiction.

HOWARD & HOWARD ATTORNEYS PLLC

## **BACKGROUND COMMON TO ALL CLAIMS**

***NRT Acquires the VisuaLimits Technology and its Trade Secrets from McClellan***

20. Prior to the acquisition by NRT, VisuaLimits, under Defendant McClellan, had developed and successfully commercialized a revolutionary table game management platform. Upon information and belief, VisuaLimits began developing its VL-Focus product as early as 2014.

21. VisuaLimits' flagship products, the VL-Focus and VL-Flex, represented a technological leap for casino operators. This platform was more than a display screen; it included a sophisticated, multi-function solution that integrated proprietary hardware and software to provide actionable business intelligence by automatically tracking key metrics like dealer performance and game utilization, consolidating disparate hardware from the gaming table into a single, elegant unit, and delivering other services including cashless payment enablement, surveillance integration, and two-way communication tools for staff and players.

22. The VisuaLimits platform was a proven commercial success, generating significant market traction and demonstrating immense value.

23. By 2017, VisuaLimits had tripled its installed base in a single year and was on track to have over 4,000 of its "intelligent" devices deployed across the industry. Its customer roster included a majority of the world's top ten casino operators, validating the platform's unique value proposition and its ability to deliver a rapid return on investment. It was this demonstrated success and the underlying proprietary technology that made VisuaLimits an attractive acquisition target for NRT.

24. On September 19, 2017, NRT acquired VisuaLimits under a Membership Interest Purchase Agreement (the "**MIPA**"), signed by Defendant McClellan.

25. In exchange, among other things, Defendant McClellan sold and conveyed to NRT his "entire right, title and interest in and to" the company and its assets.

26. The MIPA broadly defined "Intellectual Property" to include "any trade secrets and confidential or proprietary information (including any ideas, research and development, know-how . . . processes, techniques, technology . . .)."

27. To ensure a smooth transition and retain Defendant McClellan's expertise, the acquisition was conditioned on his continued involvement. As part of the transaction, Defendant

HOWARD & HOWARD ATTORNEYS PLLC

McClellan entered into a three-year employment agreement (the "**McClellan Employment Agreement**") to serve as NRT's SVP, Table Game Technology. After working for NRT for a period post-acquisition, McClellan left the company.

28. To protect the value of the assets NRT was purchasing, NRT secured critical, overlapping contractual promises from Defendant McClellan.

29. First, Section 7.02 of the MIPA imposes a strict and perpetual duty of confidentiality, stating: "Each of the Sellers . . . agrees to keep such Company Confidential Information secret and will not use or disclose Company Confidential Information to any Person."

30. The MIPA defines "Company Confidential Information" as "all confidential, proprietary or secret information related to [VisuaLimits'] business or plans, its technology, research and development, products, employees, finances, operations or the business of its customers and any notes, analyses, compilations, studies, forecasts, interpretations or other documents that are derived from, contain, reflect or are based upon any such information."

31. Second, Defendant McClellan agreed under the McClellan Employment Agreement never to "disclose or divulge any of the Confidential Information" or "use any of the Confidential Information other than on behalf of or for the direct benefit of the Company."

32. The McClellan Employment Agreement defines "Confidential Information" as including NRT's confidential information, trade secrets, and know-how concerning the business and property of NRT.

33. Third, McClellan, through the McClellan Employment Agreement, agreed that until at least September 19, 2022, he would not:

> directly or indirectly, or in any manner whatsoever, (i) compete with, or own, manage, operate, or control or participate in the ownership, management, operation or control of, or provide any services or financial resources to, any business, firm, corporation, partnership, person, proprietorship or other entity which is conducting any business which competes with the business as conducted by [NRT] . . . or (ii) be employed/engaged by any third-party that would reasonably be deemed to be a competitor to the Company, within North America.

HOWARD & HOWARD ATTORNEYS PLLC

***NRT Invests in and Develops the VL Technology with Key Partners***

34. After the acquisition, NRT invested significantly in enhancing the VisuaLimits technology and product line (the "**VL**"), entrusting its development to key personnel and contractors, who were all bound by strict contractual duties to protect NRT Confidential Information.

35. One such person was Defendant Nagata, whom NRT hired as Commercial Director on May 1, 2018, and later promoted to Vice President, Table Game Solutions, where he was given "the responsibility to head up the VisuaLimits product line."

36. Nagata's employment agreement (the "**Nagata Employment Agreement**") contained perpetual confidentiality provisions requiring him never to "disclose or divulge any of the Confidential Information" or "use any of the Confidential Information other than on behalf of or for the direct benefit of the Company." That agreement defines "Confidential Information" in the same manner as the McClellan Employment Agreement.

37. The Nagata Employment Agreement also established NRT's absolute ownership over Nagata's work product. It stipulated that all "Developments"—defined broadly to include discoveries, designs, methods, processes, and ideas—are "the exclusive property of the Company at all times." Nagata was contractually obligated to assign all rights to any such Developments to NRT.

38. Nagata agreed that for one year following his employment with NRT (i.e., until February 28, 2021), he would not "either individually or in partnership or jointly or in conjunction with any person or persons as principal, agent, shareholder . . . or in any manner whatsoever compete against [NRT] or be employed/engaged by any third-party that would reasonably be deemed to be a competitor to [NRT] within the United States."

39. NRT also engaged Defendant Object Studio as a contractor. To execute NRT's development goals, NRT entrusted the project to Defendant Object Studio, a software firm that had been deeply involved with the VisuaLimits product prior to the acquisition by NRT.

40. On May 5, 2018, NRT formalized this continuing relationship by engaging Object Studio under a Professional Services Agreement (the "**Object Studio PSA**") and a Mutual Non-Disclosure Agreement (the "**Object Studio NDA**") to provide "Technology Consulting and Development" for the VL product.

HOWARD & HOWARD ATTORNEYS PLLC

41. The Object Studio PSA established NRT's unequivocal ownership over all resulting work product. For example, Section 8.2 states that all inventions, developments, concepts, trade secrets, techniques, and know-how conceived during the project "shall be the sole property of [NRT] ('**Client Intellectual Property**')." (Emphasis added.) As the company responsible for launching core features and new products like the VL-PRO, Defendant Object Studio created a vast amount of this "Client Intellectual Property."

42. Critically, Section 8.2 of the Object Studio PSA contains an unambiguous restriction: "Provider [Object Studio] ... may not sell, rent, lease, license, sublicense, modify, time share, outsource, otherwise use or transfer Client Intellectual Property to any third party."

***The NRT Confidential Information***

43. The assets acquired by NRT from VisuaLimits, and which NRT subsequently invested heavily in to enhance, include a significant body of confidential, proprietary, and trade secret information (collectively, the "**NRT Confidential Information**").

44. The NRT Confidential Information includes, without limitation, at least the following categories of technical and business information:

a. NRT's proprietary multi-stage analytics pipeline software, including object-recognition algorithms, configurable detection parameters, game-rule logic, and analytics and reporting software;

b. NRT's confidential designs, schematics, bills of materials (BOMs), custom motherboard architecture, component selection criteria, and thermal management solutions for NRT's dual-screen hardware, developed through multiple hardware generations;

c. NRT's non-public customer lists and related information;

d. NRT's confidential business and strategic plans, including expansion planning information;

e. NRT's confidential marketing materials, platforms, information, and plans;

f. NRT's packages and the functions included in each package;

g. NRT's proprietary database-based queuing, caching, and distributed data architecture for coordinating real-time data across connected devices;

HOWARD & HOWARD ATTORNEYS PLLC

h. NRT's proprietary rating system co-residency architecture, including toggle/focus logic, peripheral forwarding, custom virtual keyboard, and vendor integration specifications;

i. NRT's proprietary camera calibration toolchain, anomaly-detection rules, camera selection parameters, and firmware management procedures;

j. NRT's proprietary TV/media streaming pipeline, including browser engine architecture, protocol selection knowledge, and performance optimization configurations;

k. NRT's accumulated negative know-how, including knowledge of failed thermal solutions, failed camera configurations, failed messaging architectures, failed browser/streaming approaches, and failed integration approaches; and

l. NRT's proprietary dealer performance metrics computation algorithms, including methods for calculating hands per hour, side-wager utilization metrics, dealer attribution logic, and dealer locator functionality.

45. The foregoing categories of NRT Confidential Information may also constitute, include, and/or encompass trade secret information under both 18 U.S.C. § 1839 and Nev. Rev. Stat. § 600A.030, as more specifically identified below.

***The NRT Trade Secrets***

46. The VL uses algorithms and source code to interact with other confidential components, algorithms, and source code, which allows the VL to perform all of its functions simultaneously. With the help of Defendants McClellan, Nagata, and Object Studio, NRT has developed the following categories of trade secrets (collectively, the "**NRT Trade Secrets**"). Not only do the specific interactions and combinations of components, processes, and systems that are identified in the larger categories below constitute NRT Trade Secrets, but many of the components, processes, and systems also qualify as NRT Trade Secrets on a standalone basis.

47. ***Trade Secret Category 1: Multi-Stage Analytics Pipeline Developed Through Camera Recognition of Game-Rule Logic.*** NRT developed a proprietary multi-stage analytics pipeline that processes objects and movement through a camera and utilizes game rules and triggers to convert the camera's data into raw business analytics. The pipeline process and its components are

described in more detail below:

a. **Camera Capabilities:** The pipeline's functional capabilities begin with the VL camera's object-recognition software that captures confidential data points from camera frames that distinguish game artifacts (chips, cards) from false positives (such as dealer arm movements and other non-game objects).

b. **Game-Rule Logic:** The camera's object recognition software and algorithms interact with the VL's selected game rules. The VL consists of approximately fifteen games (with iteratively developed game rules). The camera recognizes certain objects, timing, and points of interest based on the selected game. When a new or different game is implemented on the VL, the device's camera is trained to recognize the new points of interest, objects, game rules, game start/stop triggers, game parameters, game exceptions, object detection, and anomaly identification software. The VL then uses the camera, game rules, and other algorithms to determine (i) when the specific game rounds start and end (without NRT or casino employee intervention/assistance), (ii) how many players are present, and (iii) how dealer actions map across multiple game types (including blackjack, craps, and carnival games).

c. **Analytics and Reporting Software:** The VL then uses the camera and game rules to instantly develop analytics and statistics based on certain utilization factors, such as side bets, dealer performance, and other relevant analytics.

This pipeline process—which allows the camera to capture, process, understand, and interact with objects, rules, and triggers, while simultaneously developing real-time statistics—is a trade secret, and so are the underlying algorithms and source code that allow the pipeline process to perform these functions.

48. Upon information and belief, Defendants McClellan, Nagata, and Object Studio had knowledge of this pipeline process, its components, algorithms, and source code. Upon further information and belief, McClellan, Nagata, and/or Object Studio participated in different aspects of the pipeline process and solved numerous issues, including adjusting camera architecture, lenses, and source code to obtain the desired functionality; changing game rules, logic, game start/stop times, and the related source code to ensure the game rules functioned perfectly in combination with the VL

HOWARD & HOWARD ATTORNEYS PLLC

camera; and revising other camera and game features and source code to achieve accurate, real-time analytics.

49. Thus, upon information and belief, McClellan, Nagata, and Object Studio used the knowledge and source code that they had acquired at NRT to implement the same pipeline process and algorithms into Tavolo's competing devices.

50. ***Trade Secret Category 2: Proprietary Database-Based Queuing and Caching System.*** The VL includes a real-time messaging and data management system that transfers data across a system of connected devices in large-scale casino environments. This architecture includes the following:

a. **Message Queuing System:** It was learned over time that the Microsoft Message Queuing (MSMQ) messaging service could not handle the volume of messages generated by multiple VL devices deployed within a single casino, so the VL's messaging service was replaced with a message queuing system. The message queuing system has a custom message classification system, which uses source code and algorithms to organize messages based on the type of request/message. A routing service then directs the messages to the appropriate location based on request/message type. The message queuing system's algorithms allow it to simultaneously classify, organize, and direct messages for 50-100 VL devices at a time.

b. **Data Disruption Technology:** Data disruption and replication technology ensures continuous operation of the VL system even during network interruptions, which is critical considering casinos need to operate VL devices 24/7. If a VL device or casino suffers a network disruption, the VL's technology stores employee lists, game settings, marketing content, and table configurations within local device databases to allow for continuous operation of the VL for up to fourteen days during network outages. This software allows the VL and casinos to operate VL devices without interruption.

c. **Data Caching System:** Proprietary caching technology and algorithms store frequently-read but infrequently-changed data in memory, reducing database load and improving system responsiveness.

51. This queuing, caching, and distributed data architecture and algorithms—and their

interaction with one another—are entirely proprietary and not disclosed in any NRT patent. Object Studio authored significant portions of this infrastructure during its engagement with NRT, including the migration from the prior third-party messaging service to the proprietary queuing architecture, and thus has direct knowledge of and access to the source code for this proprietary system.

52. Upon information and belief, Object Studio, McClellan, and Nagata used such proprietary architecture, source code, and algorithms to implement the same system in the casinos where Tavolo's devices are deployed.

53. ***Trade Secret Category 3: Rating System Toggle/Co-Residency Architecture.*** NRT developed software, system architecture, and algorithms that allow third-party casino rating system applications (such as those provided by major casino management system vendors) to run concurrently with the VL's own applications (created by NRT). By doing so, the VL has eliminated separate rating system monitors from casino tables and consolidated multiple devices into a single VL unit, which opens up considerable casino/table real estate. This co-residency architecture includes:

a. **Application Software and Source Code:** Proprietary logic and code that allows the VL to quickly switch between the VL's applications and third-party rating system applications.

b. **Application Data Routing Software:** Algorithms that automatically route inputs and data from the VL's peripheral hardware devices (i.e., magnetic card swipe readers, barcode scanners, etc.) to the appropriate applications without requiring the user to switch between applications.

c. **Virtual Keyboard:** A custom-built virtual keyboard was created to meet the VL signs' dimensions, replacing the standard operating system keyboard with a custom interface optimized for the table-game context.

d. **Third-Party Integration System:** Non-public vendor integration specifications, API specifications, data field mappings, and error-handling procedures (developed through iterative integration) allow the VL to compatibly operate with multiple third-party rating systems and vendors. This knowledge and software were developed through years of working with casinos and vendors to ensure that the VL can handle multiple different types of systems, efficiently

HOWARD & HOWARD ATTORNEYS PLLC

process system updates, and perform its other functions at the same speed—regardless of the particular vendors, applications, or software being utilized.

54. This co-residency architecture is not disclosed in any NRT patent and was developed through extensive trial-and-error, as the rating system applications were difficult to obtain for laboratory testing and much of the integration required testing at live casino sites.

55. Upon information and belief, Defendants McClellan, Nagata, and Object Studio took the knowledge and code that they acquired while at NRT to incorporate the same code, algorithms, and software in the Tavolo devices.

56. ***Trade Secret Category 4: Hardware Thermal Management and Custom Motherboard Design.*** NRT developed proprietary hardware to address the unique challenges of operating a high-performing computer (24/7) within the compact, sealed enclosure of a casino table sign. The VL's proprietary hardware was developed from device failures in live casinos and customer feedback—the solutions to the VL's architectural problems are the product of multiple design iterations and span several hardware generations, including the VL-Focus, VL-Pro, and VL-Pro Plus. The proprietary hardware trade secrets include:

a. **Thermal Management Architecture and the Related Negative Know-How Processes:** Proprietary thermal/heat management architecture that was developed through multiple trial-and-error processes. Over multiple years, NRT tested different cooling strategies and architecture designs in live casinos, including fan-based cooling systems. The fan-based cooling systems faced issues because they would overheat due to smoke and other factors present in casinos. This required NRT to develop a new fanless approach that would prevent the VL from overheating. NRT eventually developed its current fanless design that utilizes a heat sink. The heat sink's thermal architecture, materials, and design geometry are non-public and not discernible from external observation of the product.

b. **The VL Motherboard:** NRT's hardware is built around a custom-designed motherboard, which allows NRT to balance processing power, heat, form factor, and cost to perform the VL's applications. The VL motherboard is equipped with specific board designs, component layouts, and performance specifications that are proprietary.

c. **Component Selection and Bills of Materials ("BOMs"):** The VL's component selections and BOMs were iteratively selected, changed, and developed to optimize the VL's processor, memory, storage, camera, display, and power supply selections. The interior materials, architecture, and components, and how such materials, architecture, and components are connected within the VL, are trade secrets.

d. **Software-hardware co-optimization:** The VL includes algorithms that allow it to fully optimize its hardware and software contemporaneously. The source code that allows the software and hardware components to interact was written—and rewritten—countless times based on the changes in design and software architecture over the years.

57. These hardware trade secrets are not disclosed in any NRT patent. Indeed, NRT's patents do not disclose the internal thermal management, motherboard design, or component selection for the VL. Upon information and belief, Defendants McClellan, Nagata, and/or Object Studio participated in the iterative process of selecting, testing, changing, and adapting the VL's hardware and software architecture to respond to numerous different issues the device faced, including the overheating issues caused by the VL's fan.

58. Upon further information and belief, Defendants implemented the same or similar hardware and software components to allow Tavolo's devices to function the same way as the VL.

59. ***Trade Secret Category 5: Camera Calibration Toolchain and Anomaly-Detection Rules.*** NRT developed tools, procedures, and software for calibrating the cameras embedded in VL signs to specific table configurations, and for maintaining accurate detection over time. This includes: (i) proprietary camera selection parameters and focal length combinations determined through iterative testing of multiple camera types and focal combinations—including those that were tested and rejected as unsuitable; (ii) a field-calibration workflow that enables non-technical casino personnel to configure and verify the camera system's detection capabilities without specialized training; (iii) proprietary anomaly detection logic that identifies impossible or improbable game states based on game duration and thresholds, object characteristics, and pattern analysis, triggering alerts or automatic recalibration notifications; and (iv) camera firmware management procedures, including knowledge of which firmware versions support certain features or specific API configuration parameters necessary to



HOWARD & HOWARD ATTORNEYS PLLC

optimize camera performance through the VL software.

60. These calibration tools and anomaly-detection rules are not disclosed in any NRT patent. While NRT's patents on "Automatic Region of Interest Detection for Casino Tables" disclose certain general methods for identifying regions and detecting events, they do not disclose the specific calibration workflow, the anomaly-detection rules, the camera selection parameters, or the firmware management procedures that NRT developed through years of iterative refinement in live casino environments.

61. Upon information and belief, Defendants McClellan, Nagata, and/or Object Studio assisted with developing such rules, parameters, procedures, and algorithms and have implemented them in the Tavolo devices to allow those devices to function at the same level as the VL and to compete with it.

62. ***Trade Secret Category 6: TV/Media Streaming Pipeline.*** NRT developed a proprietary system for streaming live television, sports scores, and advertisements to VL table signs, which addresses unique, technical challenges related to streaming content within a constrained embedded device while simultaneously running multiple concurrent applications. The proprietary elements include: (i) browser engine architecture, migration history, and knowledge of third-party platform changes and plugins that eliminated previously viable streaming approaches; (ii) protocol selection knowledge that identifies which streaming protocols are compatible with specific casino transcoder configurations, which protocols are natively supported by the chosen engine, and which require custom code-level integration (i.e., knowledge obtained through direct technical collaboration with casino IT departments regarding their specific transcoder setups); and (iii) proprietary performance optimization configurations for maintaining acceptable streaming quality on the VL platform while simultaneously running analytics, limit display, and peripheral management applications. This streaming pipeline knowledge is not disclosed in any NRT patent.

63. Upon information and belief, Defendants McClellan, Nagata, and/or Object Studio participated in developing the VL's streaming software, approaches, configurations, and code, and have implemented the same technology in developing the Tavolo Products.

64. ***Trade Secret Category 7: Accumulated Negative Know-How.*** Through more than a

HOWARD & HOWARD ATTORNEYS PLLC

decade of continuous development, NRT accumulated substantial negative know-how—knowledge of failed approaches, unsuccessful design paths, and suboptimal solutions that informed its current product design. This negative know-how has independent economic value because it enables a competitor with access to it to avoid years of costly experimentation and dead ends.

65. NRT's negative know-how includes, without limitation: (i) failed thermal solutions, knowledge that fan-based cooling systems fail in casino environments, knowledge that certain polycarbonate material compositions degrade under the thermal conditions generated by dual-display sign enclosures, and knowledge that specific power supply components fail in thermally constrained environments; (ii) failed camera configurations, including knowledge that specific camera focal lengths and configurations produce unacceptable results for table-game detection and that specific camera firmware versions lack required features or introduce incompatibilities; (iii) failed messaging architectures, including knowledge that certain third-party messaging services (such as MSMQ) cannot support the volume of messages generated by deployments of fifty to sixty or more connected signs, and the specific failure modes and scalability limitations that necessitated migration to a proprietary queuing architecture; (iv) failed browser and streaming approaches, including knowledge that specific browser engine changes and plugin deprecations eliminated previously viable streaming approaches and that specific browser engine limitations prevent certain streaming protocols from functioning on embedded table-sign devices; and (v) failed integration approaches, including knowledge of specific API patterns, data-formatting approaches, and peripheral communication configurations that do not work with common rating system vendors—knowledge obtained through iterative deployment cycles at live casino sites over multiple years.

66. This negative know-how is by its nature non-public—failed approaches are not advertised, patented, or published. McClellan, Nagata, and Object Studio each had direct exposure to this negative know-how through their years of involvement in the VL platform's development and assisted with solving many of the issues that came up along the way. Defendants were thus able to use this knowledge to bypass years of costly experiments and failed attempts when developing the Tavolo devices.

67. NRT has taken reasonable and extensive measures to protect the secrecy of the NRT

HOWARD & HOWARD ATTORNEYS PLLC

Trade Secrets, including but not limited to: the use of binding confidentiality agreements with employees, founders, and contractors (including the MIPA, the McClellan Employment Agreement, the Nagata Employment Agreement, the Object Studio PSA, and the Object Studio NDA); restricting access to source code and proprietary systems to authorized personnel; maintaining its VL signs under 24/7 surveillance; requiring non-disclosure agreements before any product pitches or presentations to prospective customers; securing its cloud-based systems behind firewalls with password-protected access limited to authorized users, who also sign confidentiality agreements; and bringing this lawsuit against Defendants.

68. The NRT Trade Secrets are not generally known or readily ascertainable by competitors. They are the product of years of costly research, development, trial-and-error, and of specific solutions to problems unique to the highly regulated casino gaming environments, developed over more than a decade of continuous iteration across multiple hardware and software generations. Indeed, for years, the VL has been deployed, tried, and tested in live casinos, and countless changes and adjustments have been made after receiving feedback from casinos, users, dealers, operators, players, and the VL itself. This information provides NRT with a significant competitive advantage.

69. For instance, competitors who do not know the NRT Trade Secrets would need substantial time (including years to test the device in live casinos), specialized expertise, and a multi-million-dollar investment to attempt to replicate it, if they could do so at all. Access to this information would allow a competitor to shortcut years of research and development, avoid failed paths, accelerate production, and unfairly win sales and market share at NRT's expense—just as Defendants did here.

70. Although NRT holds an extensive patent portfolio related to the VL product line, those patents disclose only general methods, form factors, and certain higher-level concepts.

71. NRT's patents do not disclose—and cannot be reverse-engineered to reveal—the specific proprietary implementations, source code, algorithms, calibration parameters and workflows, database schemas, queuing architectures, thermal management solutions, motherboard designs, component selection criteria, firmware management procedures, anomaly-detection rules, or accumulated negative know-how that constitute the NRT Trade Secrets.

72. The NRT Trade Secrets are thus distinct from the information disclosed in NRT's publicly available patent portfolio.

***Defendants Coordinate to Misappropriate the NRT Trade Secrets and Breach Their Contracts with NRT***

73. Despite Defendants' independent and overlapping contractual duties to protect NRT's assets, Confidential Information, and Trade Secrets, the Defendants engaged in a scheme to use the NRT Confidential Information and NRT Trade Secrets for their own benefit.

74. After Defendant McClellan's employment with NRT ended, he founded Defendant Tavolo to directly compete with NRT. McClellan's non-compete covenant under the McClellan Employment Agreement prohibited him from competing with NRT or providing services to any competitor until at least September 19, 2022. Upon information and belief, McClellan began taking steps to launch Tavolo and began directing the development of the "Stella," "Classico," and "Vista" (the "**Tavolo Products**") prior to that expiration date.

75. On February 28, 2020, Defendant Nagata resigned from NRT. Upon information and belief, Nagata began working for Defendant Object Studio in or around December of 2020.

76. Upon information and belief, since at least December of 2020 (and potentially earlier), Defendants Nagata and McClellan began competing with NRT by conspiring with Object Studio to utilize the NRT Confidential Information and implement the NRT Trade Secrets into the Tavolo Products.

77. Upon information and belief, it would have been impractical, if not impossible, for McClellan and Nagata to have conceived, designed, developed, tested, and brought to market the Tavolo Products in the approximately two-and-a-half years between the expiration of McClellan's non-compete on September 19, 2022 and Tavolo's commercial launch and exhibition at the October 2025 Global Gaming Expo.

78. Nor could Defendants have created the Tavolo Products in the roughly four-and-a-half years that elapsed between the expiration of Nagata's non-compete on February 28, 2021 and the Tavolo launch date.

79. This is particularly true given that the Tavolo Products consist of three distinct



HOWARD & HOWARD ATTORNEYS PLLC

HOWARD & HOWARD ATTORNEYS PLLC

product lines—the Stella, Classico, and Vista—each requiring its own hardware design, software integration, and testing. A competitor starting from scratch, even one with knowledge of NRT's proprietary technology, would need to progress through each of the development phases described above sequentially, and many of those phases—particularly hardware prototyping, thermal testing, camera calibration refinement, and live casino field testing—cannot be compressed or parallelized.

80. Developing a product of the scope and complexity of the VL requires, at a minimum, multiple sequential phases of development: product conception and strategic planning; hardware design, prototyping, and iterative testing; software architecture design and coding; integration of hardware and software components; field testing and iterative refinement in live casino environments; regulatory compliance and gaming commission approvals; and commercial launch preparation including marketing, sales infrastructure, and customer demonstrations.

81. NRT's own development of comparable technology required more than a decade of continuous work across multiple hardware generations (VL-Focus, VL-Pro, VL-Pro Plus) and an investment of millions of dollars.

82. McClellan and Nagata's violation of their respective non-compete periods is further supported by the fact that Nagata began working for Object Studio in approximately December 2020—more than twenty months before McClellan's non-compete expired—and assumed the role of Chief Operating Officer, a senior leadership position requiring involvement from the earliest stages of a business initiative.

83. Upon information and belief, McClellan coordinated with Nagata and Object Studio during this period to direct the development of the Tavolo Products, leveraging Defendants' collective knowledge of NRT's proprietary technology.

84. The only plausible explanation for the speed with which Tavolo developed and brought to market products replicating the full breadth of NRT's VL platform is that Defendants began substantive development work, including product conception, hardware design, software architecture, and contractor coordination, well before McClellan's non-compete expired on September 19, 2022 and before Nagata's non-compete expired on February 28, 2021 (in addition to misappropriating NRT Trade Secrets).

HOWARD & HOWARD ATTORNEYS PLLC

85. Thus, upon information and belief, Defendants did in fact begin substantive development work on the Tavolo Products prior to the expiration of McClellan's non-compete on September 19, 2022 and prior to the expiration of Nagata's non-compete on February 28, 2021.

86. Upon information and belief, Defendants retained access to, copies of, or detailed knowledge of NRT's proprietary source code, architectural documentation, and confidential development materials after their respective departures from NRT. Specifically, Object Studio's principal developer and development team authored significant portions of NRT's proprietary source code and, upon information and belief, retained copies of or access to that source code and related documentation after Object Studio's engagement with NRT ended in March of 2020.

87. Defendant McClellan, as the original developer of the VL technology and a party to the MIPA, possessed intimate knowledge of the VL's foundational architecture, hardware design history, and accumulated negative know-how from over a decade of development. Upon information and belief, McClellan retained confidential materials and proprietary knowledge belonging to NRT after his departure.

88. Defendant Nagata, as NRT's Vice President responsible for the entire VL product line, had access to NRT's most sensitive proprietary systems, including source code repositories, hardware design files, strategic product roadmaps, customer data, and internal communications reflecting NRT's proprietary solutions and negative know-how. Upon information and belief, Nagata retained confidential NRT materials, including emails and documents referencing NRT's proprietary analytics logic and development strategies, after his resignation in February 2020.

89. Object Studio's principal developer and team authored significant portions of NRT's proprietary queuing, caching, and data distribution infrastructure, including the migration from a prior third-party messaging service to NRT's proprietary queuing architecture, and thus had direct knowledge of—and access to the code for—these proprietary systems.

90. Upon information and belief, Defendant Object Studio, with the assistance of Defendant Nagata's deep knowledge of NRT's technology and strategic plans, then used the NRT Trade Secrets it was paid to create for NRT to develop competing products for Defendant McClellan's new company, Defendant Tavolo.

HOWARD & HOWARD ATTORNEYS PLLC

91. Given Object Studio's authorship of NRT's proprietary queuing system (with the assistance of Nagata) and its subsequent engagement with Tavolo, it is implausible that Object Studio developed an entirely independent messaging architecture for Tavolo without drawing upon the proprietary knowledge and solutions it developed for NRT. Tavolo markets its products as capable of supporting multi-table casino deployments with real-time analytics, which necessarily requires a comparable real-time messaging infrastructure.

92. The only way development of the Tavolo Products could have commenced ***after*** the expiration of Nagata and McClellan's non-competes would have been for Defendants to directly copy NRT's source code, algorithms, and software architecture and pass them off as their own through the Tavolo Products. Thus, given the short time frame in which the Tavolo Products were launched, upon information and belief, McClellan and Nagata violated their non-competes ***and*** misappropriated the NRT Trade Secrets, with the help of Object Studio and Tavolo.

93. The Tavolo product line includes the "Stella," "Classico," and "Vista." Below are images from Defendant Tavolo's website related to these products:

HOWARD & HOWARD ATTORNEYS PLLC




## STELLA

*The Star of the Lineup*

The sleek and durable 1.5" table management system that saves space and boosts style. With dual 10.1" screens (player-facing and staff-facing), Stella offers advanced features like player privacy, customizable interfaces, card swipe and barcode readers, TV streaming, and real-time sports scores. Made from robust aluminum, it's cost-effective, efficient, and designed to elevate your gaming environment.




## VISTA

*Designed with Compliance in Mind*

Vista is your compliance-savvy, camera-powered solution for smarter gaming operations. It delivers real-time insights on table game performance, dealer efficiency, and side wagers—while keeping an eye out for errors or cheating. Simple, cost-effective, and always on point.

## CLASSICO

*Timeless Design Meets Modern Functionality*

Classico is your go-to if you want the market's best limit sign at a competitive price. Classico works standalone or with your existing Rating System Monitor for added functionality. It is the ideal companion for Roulette and Craps, featuring a 10.1 inch player-facing screen for game details and ads, plus a 2.8-inch rear display for limits and staff updates. Made from durable aluminum, it offers an optional 15.6-inch touchscreen on a flexible arm to enhance player experience and operational efficiency.



HOWARD & HOWARD ATTORNEYS PLLC

(from https://www.tavolotech.com/product)

94. The Tavolo Products are substantially similar to NRT's products, including NRT's proprietary VL products, and the development of the Tavolo Products necessarily relied on the NRT Trade Secrets.

95. Specifically, upon information and belief, Tavolo's "Vista" product advertises "camera-powered" analytics including "Analyzing Dealer Hands Per Hour," "Monitoring Dealer Hands Per Hour," "Tracking Side Wager Utilization," and "Detecting Errors and Cheats"—the same analytics capabilities that NRT's proprietary multi-stage analytics pipeline produces and that require the proprietary game-rule logic and data architecture described above.

96. Tavolo's "Vista" product also advertises camera-based analytics using "existing overhead cameras" and a "user-friendly" setup process; the ability to offer that user-friendly camera setup, rather than requiring extensive technical calibration, is directly attributable to the calibration toolchain knowledge that was developed at NRT over years of iterative refinement. Upon information and belief, Tavolo's products also have cameras positioned inside the sign and in the "O" of the Tavolo logo, which mirror NRT's proprietary camera placement and vantage point design.

97. Tavolo's "Stella" product advertises a "Rear Screen… for player ratings" and "TV Streaming capabilities for additional entertainment" and "Media Management Software Suite for dynamic media control"—indicating that Tavolo offers rating system integration and streaming capabilities comparable to those achieved through NRT's proprietary co-residency architecture and streaming pipeline.

98. Tavolo's "Classico" product advertises that it "works standalone or with your existing Rating System Monitor for added functionality," further evidencing use of NRT's proprietary rating system integration knowledge.

99. Tavolo markets its products as featuring "robust aluminum" construction and a slim-line form factor, and upon information and belief, Tavolo's hardware design reflects thermal management approaches that are consistent with the lessons learned through NRT's multi-generational hardware development process—lessons that are not publicly available and that could not have been arrived at without the iterative design, testing, and field-deployment experience that McClellan, Object

HOWARD & HOWARD ATTORNEYS PLLC

Studio, and Nagata gained while developing NRT's hardware.

100. Indeed, upon information and belief, Tavolo's current hardware design includes earlier design work for NRT, which evidences that Tavolo's hardware was not independently developed.

101. The similarities between Tavolo's products and NRT's proprietary VL platform extend far beyond surface-level product features and reflect the use of NRT's specific, non-public trade secrets in ways that could not result from independent development or reverse engineering.

102. Specifically, upon information and belief: (a) Tavolo's real-time messaging infrastructure employs a database-based queuing and caching architecture that is functionally identical to the proprietary system Object Studio built for NRT (including the same message classification methodology, routing logic, and data disruption technology that enables continued device operation during network outages), which was never publicly disclosed and could not have been independently developed without access to NRT's proprietary source code; (b) Tavolo's camera-based analytics system employs a multi-stage pipeline that mirrors NRT's proprietary process of capturing objects via camera recognition, applying game-rule logic to identify game events, and generating real-time analytics, a process that requires iterative calibration across multiple game types and that NRT developed over more than a decade of field testing in live casinos; (c) Tavolo's hardware design reflects specific thermal management approaches (including a fanless heat sink design with proprietary geometry) that are consistent with the solutions NRT arrived at only after years of iterative testing and failure of alternative approaches (including fan-based cooling systems), and that are not discernible from external observation of NRT's products; (d) Tavolo's products offer rating system integration capabilities that require the same proprietary toggle/co-residency architecture, virtual keyboard design, and vendor-specific API integration specifications that NRT developed through years of direct collaboration with casino operators and rating system vendors; (e) Tavolo's current hardware design—including internal component layouts and thermal management features—reflects NRT's earlier design work, confirming that Tavolo's hardware incorporates NRT's proprietary specifications rather than independently developed solutions; and (f) the user-friendly camera setup process advertised by Tavolo is directly attributable to NRT's proprietary calibration toolchain, which was developed over

HOWARD & HOWARD ATTORNEYS PLLC

years of iterative refinement and is not publicly available.

103. Given the depth of involvement by Defendants McClellan, Nagata, and Object Studio in the creation, enhancement, and strategic planning of the VL product line, it is inevitable that they disclosed and used NRT's trade secrets in launching the Tavolo Products.

104. Defendant McClellan sold the VL intellectual property to NRT and was contractually bound never to use it again; Defendant Nagata was entrusted with managing and developing that technology and was intimately familiar with its architecture, software, and strategic roadmap; and Defendant Object Studio was paid to build core components of the VL system under agreements that made NRT the exclusive owner of all resulting work product.

105. Simply put, the knowledge possessed by these Defendants is so specialized, detailed, and integral to NRT's products that it is impossible for them to compartmentalize or unlearn that knowledge. McClellan, as the founder of VisuaLimits, was involved in the original hardware design process and experienced or directed the resolution of many of the failures constituting NRT's negative know-how. Object Studio authored code changes addressing the messaging architecture migration, the queuing system development, and other architectural pivots. Nagata was exposed to hardware design discussions during VL-Pro development, was exposed to customer-facing consequences of failed approaches, and participated in discussions about proprietary solutions, including sending a 2019 email referencing NRT's proprietary analytics logic.

106. The striking similarities in business strategy, product design, functionality, marketing language, and time to market all demonstrate that Defendants have misappropriated NRT's specific trade secrets to create the Tavolo Products, bypassing years of research and development.

107. In particular, the speed with which Tavolo brought to market a product offering substantially identical features—including camera-based analytics, dealer performance tracking, rating system integration, TV streaming, and a dual-screen form factor with comparable thermal management—is inexplicable absent access to and use of the NRT Trade Secrets.

108. A competitor developing these capabilities independently would need to replicate NRT's iterative development process, including discovering and resolving the same failures, dead ends, and edge cases that NRT addressed over more than a decade of continuous development. Upon

HOWARD & HOWARD ATTORNEYS PLLC

information and belief, Defendants' access to NRT's negative know-how alone—their knowledge of which approaches fail and why—enabled them to skip directly to NRT's proven solutions without the years of costly experimentation required to arrive at them independently.

109. The conclusion that Defendants misappropriated NRT's trade secrets, rather than independently developing competing technology through lawful means, is further supported by the following facts that are inconsistent with independent development: (a) the Tavolo Products replicate not just individual features but the entire integrated architecture of the VL platform—including camera-based analytics, dealer performance tracking, rating system co-residency, TV streaming, real-time messaging, and thermal management in a dual-screen form factor—a combination of capabilities that is unique to NRT's platform and that no other competitor in the industry has replicated; (b) a competitor independently developing such a comprehensive platform would need to discover and resolve the same failures, dead ends, and edge cases that NRT addressed over more than a decade—including failed fan-based cooling systems, failed third-party messaging services, failed camera configurations, and failed browser engine approaches—yet Tavolo brought its products to market without any apparent period of iterative failure and refinement; (c) Tavolo's products avoid the specific design pitfalls and failure modes that NRT encountered during development—such as the use of fan-based cooling in casino environments and reliance on third-party messaging services for high-volume device deployments—which is consistent with Defendants' access to NRT's negative know-how and inconsistent with independent development; (d) the simultaneous launch of three distinct product lines (Stella, Classico, and Vista), each with separate hardware and software requirements, would be extraordinarily difficult for a startup competitor without access to a pre-existing body of proprietary development work; and (e) the gaming table management industry is highly specialized, with a limited number of competitors, and no other entrant has been able to replicate the breadth and sophistication of NRT's VL platform—making Tavolo's rapid achievement of comparable functionality inexplicable absent access to NRT's proprietary technology.

## FIRST CLAIM FOR RELIEF

### (Misappropriation of Trade Secrets—18 U.S.C. § 1836 et seq.—All Defendants)

110. NRT repeats and incorporates by reference the allegations set forth in the foregoing

HOWARD & HOWARD ATTORNEYS PLLC

paragraphs.

111. The NRT Trade Secrets provide NRT with a valuable competitive advantage by enabling NRT at least to (a) deliver uniquely accurate and actionable analytics, including table game performance, dealer efficiency, and side wagers; (b) deploy and maintain scalable, secure, and fault-tolerant software and firmware across dual-screen table devices; (c) integrate reliably and efficiently with third-party casino systems and peripherals through proprietary APIs and protocols; (d) manufacture dual-screen hardware with optimized bill of materials and thermal and security characteristics; and (e) reduce development cycles and costs by leveraging hard-won negative know-how.

112. Competitors who lack this information would need substantial time, specialized expertise, and a multi-million-dollar investment to attempt to replicate it, if they could do so at all. Access to the NRT Trade Secrets would allow a competitor to shortcut years of research and development, avoid failed paths, accelerate productization, and unfairly win sales and market share at NRT's expense.

113. As a result, the NRT Trade Secrets derive independent economic value from not being generally known to—and not being readily ascertainable by proper means by—others who can obtain economic value from its disclosure or use, including competing providers of table game management systems, analytics platforms, and related hardware.

114. Knowledge of the NRT Trade Secrets would permit a competitor to rapidly reproduce NRT's product architecture, analytics algorithms, database schema, build and deployment automations, hardware form factors, and integration methods; to avoid years of trial and error and the associated costs; and to offer substantially similar functionality and performance, thereby gaining an immediate and unfair market advantage.

115. Upon information and belief, that is precisely what happened here, as Defendant McClellan improperly used and disclosed the NRT Trade Secrets to unfairly launch the competing Tavolo Products.

116. The NRT Trade Secrets constitute trade secrets under 18 U.S.C. § 1839.

117. Defendant McClellan misappropriated the NRT Trade Secrets through unauthorized

HOWARD & HOWARD ATTORNEYS PLLC

use and disclosure.

118. With respect to unauthorized ***use***, after selling his interest in VisuaLimits and the associated NRT Trade Secrets to NRT and agreeing under the MIPA never to use or disclose the NRT Trade Secrets, Defendant McClellan founded Defendant Tavolo, a direct competitor. Upon information and belief, McClellan then used his knowledge of the NRT Trade Secrets to direct and guide the development of the Tavolo Products, thereby breaching his perpetual duty of confidentiality and allowing Tavolo to create a competing product in a fraction of the time it would have otherwise taken.

119. With respect to unauthorized ***disclosure***, upon information and belief, Defendant McClellan disclosed the NRT Trade Secrets to Defendants Nagata and Object Studio for the express purpose of having them build out Tavolo's product line, knowing that they were also bound by separate duties of confidentiality to NRT.

120. Upon information and belief, Defendant Nagata likewise misappropriated the NRT Trade Secrets under 18 U.S.C. § 1839 because, after resigning from NRT and while working with Object Studio, he disclosed and used NRT Trade Secrets to assist in the design, development, and commercialization of competing table game management and analytics products for Object Studio and Tavolo, without NRT's consent.

121. At the time of such disclosure and use, Defendant Nagata knew or had reason to know that his knowledge of the NRT Trade Secrets (i) were acquired under duties of confidentiality and restricted use and (ii) were being used for the benefit of third parties in direct competition with NRT. Upon information and belief, Defendant Nagata further breached his duties by retaining, referencing, or conveying NRT Trade Secrets outside NRT in connection with the Tavolo Products.

122. Upon information and belief, Defendant Object Studio also misappropriated the NRT Trade Secrets under 18 U.S.C. § 1839 because it used and disclosed NRT Trade Secrets to develop competing table management and analytics products substantially and materially identical to NRT's VL product line, without NRT's consent and in direct violation of the Object Studio PSA's express prohibition on any third-party use or transfer.

123. At the time of such use and disclosure, Object Studio knew or had reason to know

HOWARD & HOWARD ATTORNEYS PLLC

that (i) the NRT Trade Secrets were acquired under circumstances giving rise to duties to maintain secrecy and limit use and (ii) its knowledge was derived from persons who owed duties to NRT. Upon information and belief, Object Studio also induced and/or encouraged breaches of these duties to obtain and exploit NRT Trade Secrets.

124. Defendant Tavolo likewise misappropriated the NRT Trade Secrets under 18 U.S.C. § 1839 because it acquired, used, and continues to use NRT Trade Secrets without NRT's consent to design, market, and sell the Tavolo Products, which copy the core functionality, architecture, analytics, and hardware of NRT's products. At the time of acquisition, disclosure, and use, Tavolo knew or had reason to know that the NRT Trade Secrets (i) were derived from or through persons who had used improper means or who owed duties to NRT to maintain secrecy and limit use, including Defendants McClellan (subject to the MIPA's perpetual confidentiality obligations), Object Studio (subject to the Object Studio PSA/NDA restrictions), and Nagata (subject to the Nagata Employment Agreement) and (ii) constituted trade secrets.

125. Upon information and belief, Defendant Tavolo further directed, solicited, and/or knowingly benefited from these breaches and resulting disclosures.

126. NRT's products designed and manufactured from the NRT Trade Secrets are sold throughout the United States, and, upon information and belief, Defendant Tavolo sells such products throughout the United States. Both NRT's and Defendant Tavolo's products are therefore "used in, or intended for use in, interstate or foreign commerce" under 18 U.S.C. § 1836(b)(1).

127. Defendants' misappropriation is ongoing, and on information and belief, the misappropriation began in or around 2020.

128. Indeed, independent of the specific acts referenced above, the roles, responsibilities, and ongoing conduct described above make Defendants' continued use and disclosure of the NRT Trade Secrets inevitable.

129. In the ordinary course of designing, refining, integrating, marketing, and servicing their competing table-management and analytics products, Defendants McClellan, Nagata, Object Studio, and Tavolo necessarily must rely on and exploit NRT Trade Secrets, including the non-public architectural choices, algorithms, data schemas, integration methods, negative know-how, and product

roadmaps.

130. NRT has suffered and will continue to suffer economic harm as a result of Defendants' misappropriation and is entitled to recover damages in an amount to be proven at trial.

131. NRT has been and will continue to be irreparably harmed unless Defendants' misappropriation is enjoined.

## SECOND CLAIM FOR RELIEF

**(Misappropriation of Trade Secrets—Nev. Rev. Stat. § 600A.010 et seq.—All Defendants)**

132. NRT repeats and incorporates by reference the allegations set forth in the foregoing paragraphs.

133. The NRT Trade Secrets constitute trade secrets under Nev. Rev. Stat. § 600A.030 because they derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from their disclosure or use, and because NRT undertakes efforts that are reasonable under the circumstances to maintain their secrecy.

134. Defendants' acquisition, disclosure, and use of NRT Trade Secrets constitute "misappropriation" under Nev. Rev. Stat. § 600A.030(2), including acquisition by improper means, disclosure without consent by persons who had a duty to maintain secrecy, and use without consent by persons who knew or had reason to know that the NRT Trade Secrets were acquired under circumstances giving rise to a duty to maintain secrecy or limit use.

135. Specifically, upon information and belief, Defendant McClellan misappropriated NRT Trade Secrets to found and operate Defendant Tavolo, and by disclosing NRT Trade Secrets to Defendants Nagata, Object Studio, and Tavolo for the purpose of developing competing products. McClellan acquired NRT Trade Secrets under circumstances giving rise to a perpetual duty to maintain their secrecy and limit their use.

136. Upon information and belief, Defendant Nagata misappropriated NRT Trade Secrets to assist Defendants Object Studio and Tavolo in developing competing products, without NRT's consent. At the time of disclosure and use, Nagata knew or had reason to know that the NRT Trade Secrets were acquired under circumstances giving rise to such a duty.

HOWARD & HOWARD ATTORNEYS PLLC

137. Upon information and belief, Defendant Object Studio misappropriated NRT Trade Secrets by using and disclosing NRT Trade Secrets to develop competing products for Defendant Tavolo, without NRT's consent and in direct violation of the Object Studio PSA's express prohibition on any third-party use or transfer.

138. At the time of such use and disclosure, Object Studio knew or had reason to know that the NRT Trade Secrets were acquired under circumstances giving rise to a duty to maintain secrecy.

139. Upon information and belief, Defendant Tavolo misappropriated NRT Trade Secrets to design, manufacture, market, and sell the Tavolo Products.

140. At the time of such acquisition and use, Tavolo knew or had reason to know that the NRT Trade Secrets were acquired from persons who had utilized improper means to acquire NRT Trade Secrets or who owed a duty to NRT to maintain their secrecy or limit their use.

141. Defendants' misappropriation of the NRT Trade Secrets was willful and malicious, entitling NRT to exemplary damages of up to twice the amount of any damages award under Nev. Rev. Stat. § 600A.050(2).

142. NRT has suffered and will continue to suffer economic harm as a result of Defendants' misappropriation and is entitled to recover damages in an amount to be proven at trial.

143. NRT has been and will continue to be irreparably harmed unless Defendants' misappropriation is enjoined.

**<u>THIRD CLAIM FOR RELIEF</u>**

**(Breach of Contract—Defendant McClellan)**

144. NRT repeats and incorporates by reference the allegations set forth in the foregoing paragraphs.

145. The MIPA is a valid and enforceable contract.

146. NRT has fully performed its obligations under the MIPA.

147. The MIPA imposes a perpetual duty upon Defendant McClellan to keep the NRT Confidential Information secret and not to use or disclose it.

148. McClellan breached the MIPA at least by using and/or disclosing Company

HOWARD & HOWARD ATTORNEYS PLLC

Confidential Information, including VisuaLimits-derived technology, know-how, source code, architecture, designs, customer-related information, negative know-how, and derivative materials acquired by NRT under the MIPA, to develop and sell competing products through his company, Tavolo.

149. As a direct result of Defendant McClellan's breach, NRT has suffered and continues to suffer economic harm and is entitled to recover damages in an amount to be proven at trial.

150. NRT has been and will continue to be irreparably harmed unless Defendant McClellan's ongoing breach is enjoined.

**FOURTH CLAIM FOR RELIEF**

**(Breach of Contract—Defendant McClellan)**

151. NRT repeats and incorporates by reference the allegations set forth in the foregoing paragraphs.

152. The McClellan Employment Agreement is a valid and enforceable contract.

153. NRT has fully performed its obligations under the McClellan Employment Agreement.

154. Under the McClellan Employment Agreement, McClellan agreed not to "disclose or divulge any of the Confidential Information" or "use any of the Confidential Information other than on behalf of or for the direct benefit of the Company."

155. Defendant McClellan breached the McClellan Employment Agreement at least by using the NRT Confidential Information to develop and sell a competing product through his company, Tavolo.

156. As a direct result of Defendant McClellan's breach, NRT has suffered and continues to suffer economic harm and is entitled to recover damages in an amount to be proven at trial.

157. NRT has been and will continue to be irreparably harmed unless Defendant McClellan's ongoing breach is enjoined.

**FIFTH CLAIM FOR RELIEF**

**(Breach of Contract—Defendant Nagata)**

158. NRT repeats and incorporates by reference the allegations set forth in the foregoing

paragraphs.

159. The Nagata Employment Agreement is a valid and enforceable contract.

160. NRT has fully performed its obligations under the Nagata Employment Agreement.

161. Defendant Nagata breached the Nagata Employment Agreement at least by using and disclosing NRT Confidential Information for the benefit of Defendants Object Studio and Tavolo.

162. As a direct result of Defendant Nagata's breach, NRT has suffered and continues to suffer economic harm and is entitled to recover damages in an amount to be proven at trial.

163. NRT has been and will continue to be irreparably harmed unless Defendant Nagata's ongoing breach is enjoined.

**SIXTH CLAIM FOR RELIEF**

**(Breach of Contract—Defendant Object Studio)**

164. NRT repeats and incorporates by reference the allegations set forth in the foregoing paragraphs.

165. The Object Studio NDA is a valid and enforceable contract.

166. NRT has fully performed its obligations under the Object Studio NDA.

167. Defendant Object Studio breached the Object Studio NDA at least by using the NRT Confidential Information for a purpose outside the limited scope for which it was disclosed.

168. As a direct result of Defendant Object Studio's breaches, NRT has suffered and will continue to suffer economic harm and is entitled to recover damages in an amount to be proven at trial.

169. NRT has been and will continue to be irreparably harmed unless Defendant Object Studio's ongoing breach is enjoined.

**SEVENTH CLAIM FOR RELIEF**

**(Breach of Contract—Defendant Object Studio)**

170. NRT repeats and incorporates by reference the allegations set forth in the foregoing paragraphs.

171. The Object Studio PSA is also a valid and enforceable contract.

172. NRT has fully performed its obligations under the Object Studio PSA.

173. Defendant Object Studio breached the Object Studio PSA at least by using and

transferring NRT's "sole and exclusive" Client Intellectual Property to a third party—Defendant Tavolo—in direct violation of Section 8.2.

174. As a direct result of Defendant Object Studio's breaches, NRT has been and will continue to be damaged or otherwise harmed in an amount to be proven at trial.

175. NRT has been and will continue to be irreparably harmed unless Defendant Object Studio's ongoing breach is enjoined.

## EIGHTH CLAIM FOR RELIEF

***(Breach of Non-Compete Covenant—Defendant McClellan)***

176. NRT repeats and incorporates by reference the allegations set forth in the foregoing paragraphs.

177. The McClellan Employment Agreement is a valid and enforceable contract that contains a restrictive covenant prohibiting Defendant McClellan from, directly or indirectly, competing with NRT, providing services or financial resources to any business that competes with NRT, or being employed or engaged by any third party that would reasonably be deemed to be a competitor to NRT, within North America, until at least September 19, 2022.

178. NRT has fully performed its obligations under the McClellan Employment Agreement, including providing McClellan with valuable consideration in the form of employment, compensation, and access to NRT Confidential Information.

179. Upon information and belief, Defendant McClellan breached the non-compete covenant at least by founding and operating Defendant Tavolo, and by providing services, financial resources, and strategic direction to Tavolo while subject to restrictive covenants. McClellan further breached by being employed or engaged by Tavolo, an entity that is reasonably deemed to be a competitor to NRT, while subject to non-compete restrictions.

180. Upon information and belief, Defendant McClellan began competing with NRT and taking material steps toward the development of the Tavolo Products during the restricted period.

181. The Tavolo Products are of such complexity that they could not have been conceived, designed, developed, tested, and brought to market in the roughly two-and-a-half years between the expiration of McClellan's non-compete on September 19, 2022 and Tavolo's commercial launch in



HOWARD & HOWARD ATTORNEYS PLLC

2025.

182. NRT's own development of comparable technology required more than a decade of continuous iteration, multi-generational hardware development, and millions of dollars of investment.

183. It is therefore implausible, and, upon information and belief, factually impossible, that McClellan developed Tavolo's competing products without initiating substantive competitive activities, including product conception, design direction, business planning, contractor engagement, and strategic development, while his non-compete remained in effect.

184. In addition, Defendant McClellan solicited Defendants Nagata and Object Studio—both of whom had deep knowledge of NRT Confidential Information and NRT Trade Secrets—to join the competing venture.

185. Upon information and belief, Nagata began working for Object Studio in approximately December 2020, more than twenty months before McClellan's non-compete expired, and McClellan engaged these parties during or shortly after that time precisely because a project of this magnitude required early coordination with individuals possessing specialized knowledge of the very trade secrets McClellan had sold to NRT.

186. The timeline of Tavolo's development, from concept through three distinct product lines (Stella, Classico, and Vista), each requiring separate hardware design, software integration, and testing, to a market-ready product capable of being exhibited at the October 2025 Global Gaming Expo, is inconsistent with development beginning only after McClellan's non-compete lapsed on September 19, 2022.

187. The non-compete covenant is reasonable in scope, duration, and geographic limitation, and is supported by adequate consideration, including McClellan's receipt of substantial compensation and access to the NRT Confidential Information during his employment.

188. As a direct result of Defendant McClellan's breach of the non-compete covenant, NRT has suffered and continues to suffer economic harm and is entitled to recover damages in an amount to be proven at trial, including lost sales, lost market share, and lost business opportunities resulting from Tavolo's entry into the market.

189. NRT has been and will continue to be irreparably harmed unless Defendant



HOWARD & HOWARD ATTORNEYS PLLC

McClellan's ongoing breach of the non-compete covenant is enjoined.

**NINTH CLAIM FOR RELIEF**

***(Breach of Non-Compete Covenant—Defendant Nagata)***

190. NRT repeats and incorporates by reference the allegations set forth in the foregoing paragraphs.

191. The Nagata Employment Agreement is a valid and enforceable contract that contains a restrictive covenant prohibiting Defendant Nagata from, for a period of one year following the termination of his employment with NRT (i.e., until February 28, 2021), either individually or in partnership or jointly or in conjunction with any person, competing against NRT or being employed or engaged by any third party that would reasonably be deemed to be a competitor to NRT within the United States.

192. NRT has fully performed its obligations under the Nagata Employment Agreement, including providing Nagata with valuable consideration in the form of employment, compensation, promotion to Vice President, and access to the NRT Confidential Information.

193. Defendant Nagata breached the non-compete covenant by providing services, expertise, and strategic direction to Object Studio and Tavolo while subject to the restrictive covenant. Nagata further breached his non-compete by being employed or engaged by Object Studio, an NRT competitor, as it is engaged in the development and sale of table game management systems that directly compete with NRT's VL product line.

194. Upon information and belief, Defendant Nagata began working for Defendant Object Studio in or about December 2020—well within the one-year restricted period following his resignation on February 28, 2020.

195. Upon information and belief, Defendant Nagata necessarily began competing with NRT and taking material steps toward the development of the Tavolo Products during the restricted period. The Tavolo Products are of such complexity that they could not have been conceived, designed, developed, tested, and brought to market in the time between the expiration of Nagata's non-compete on February 28, 2021, and Tavolo's commercial launch in 2025. NRT's own development of comparable technology required more than a decade of continuous iteration, multi-generational



HOWARD & HOWARD ATTORNEYS PLLC

HOWARD & HOWARD ATTORNEYS PLLC

hardware development, and millions of dollars of investment.

196. It is therefore implausible—and, upon information and belief, factually impossible—that Nagata contributed to the development of Tavolo's competing products without initiating substantive competitive activities, including product architecture decisions, technology selection, strategic product positioning, and hands-on development work, while his non-compete remained in effect.

197. In addition, Defendant Nagata assumed the role of Chief Operating Officer at Object Studio, a role requiring strategic oversight from the inception of a business initiative, not one assumed midstream, and brought to this role his intimate knowledge of NRT's proprietary systems as NRT's former Vice President responsible for heading the entire VL product line. Upon information and belief, Nagata's engagement with Object Studio and Tavolo required early participation in foundational decisions about product architecture, market strategy, and resource allocation, decisions that necessarily drew upon the specialized knowledge Nagata acquired at NRT.

198. The timeline of Tavolo's development, from concept through a market-ready product capable of being exhibited at the October 2025 Global Gaming Expo, is inconsistent with Nagata's involvement beginning only after the non-compete lapsed and is consistent only with Nagata having initiated competitive activities during the restricted period.

199. It is also notable that Nagata resigned from NRT less than one month before Object Studio's engagement with NRT ended—and that Nagata had worked directly with Object Studio to develop and advance the VL product line and solve problems as they arose.

200. Nagata's non-compete covenant is reasonable in scope, duration, and geographic limitation. The one-year duration is narrowly tailored, the geographic limitation to the United States is appropriate given NRT's nationwide business operations, and the restriction is supported by adequate consideration, including Nagata's receipt of employment, promotion, compensation, and access to NRT's most sensitive trade secrets and confidential business information.

201. As a direct result of Defendant Nagata's breach of the non-compete covenant, NRT has suffered and continues to suffer economic harm and is entitled to recover damages in an amount to be proven at trial, including lost sales, lost market share, and accelerated competitive entry by Tavolo

HOWARD & HOWARD ATTORNEYS PLLC

into the market.

202. NRT has been and will continue to be irreparably harmed unless Defendant Nagata's breach of the non-compete covenant is enjoined.

**TENTH CLAIM FOR RELIEF**

**(Tortious Interference—Defendants Tavolo and Object Studio)**

203. NRT repeats and incorporates by reference the allegations set forth in the foregoing paragraphs.

204. NRT has valid and existing contracts with Defendant McClellan (the MIPA) and Nagata (the Nagata Employment Agreement).

205. Upon information and belief, Defendant Tavolo had knowledge of the MIPA and intentionally acted to induce Defendant McClellan to breach his perpetual confidentiality duties for Defendant Tavolo's direct financial benefit.

206. Specifically, Defendant Tavolo, founded and controlled by McClellan, was structured and operated for the express purpose of commercializing information and technology McClellan had sold to NRT, including Company Confidential Information and NRT Trade Secrets derived from or related to the VisuaLimits technology, which McClellan had agreed not to use or disclose.

207. Upon information and belief, Tavolo actively solicited and directed McClellan to provide the NRT Confidential Information and NRT Trade Secrets to Tavolo for the development of the Tavolo Products.

208. These acts went beyond mere knowledge of McClellan's contractual duties and constituted deliberate, affirmative steps to procure McClellan's breach of the MIPA for Tavolo's commercial gain.

209. Upon information and belief, Defendant Object Studio knew or had reason to know of Defendant Nagata's contractual duties to NRT, including his perpetual confidentiality obligations and his assignment of all intellectual property developed during his employment, because Object Studio had itself been a contractor to NRT and was familiar with the types of restrictive agreements NRT required of its personnel.

210. Despite this knowledge, Object Studio intentionally acted to induce Nagata to breach

HOWARD & HOWARD ATTORNEYS PLLC

those duties by hiring him specifically to leverage his knowledge of NRT's proprietary systems to develop competing products for Tavolo.

211. Object Studio induced Nagata to breach his contractual confidentiality, non-use, and assignment obligations, including obligations covering NRT Confidential Information and Developments, regardless of whether every item of information independently qualifies as a statutory trade secret.

212. Upon information and belief, Object Studio offered Nagata the position of Chief Operating Officer—a senior leadership role requiring involvement in product architecture, development strategy, and technology decisions—precisely because of his intimate knowledge of the NRT Confidential Information and the NRT Trade Secrets.

213. Upon information and belief, Object Studio's hiring of Nagata was not for his general industry expertise but was specifically motivated by his deep familiarity with NRT's proprietary analytics pipeline, hardware design history, and software architecture, and Object Studio directed Nagata to apply that proprietary knowledge to the development of Tavolo's competing products.

214. Independent of the trade secret misappropriation, Defendants Tavolo and Object Studio's tortious interference caused NRT distinct and independent harm by disrupting the contractual relationships between NRT and its former key personnel, depriving NRT of the benefit of its bargained-for restrictive covenants, and enabling a competitor to enter the market with an unfair head start.

215. This interference with NRT's contractual relationships—including McClellan's perpetual confidentiality duties and Nagata's employment obligations—caused NRT to lose the competitive protection those agreements were designed to provide, resulting in lost sales, lost market share, and diminished goodwill that would have occurred regardless of whether any trade secrets were ultimately found to have been misappropriated.

216. As a direct result of this wrongful interference, NRT has suffered and will continue to suffer economic harm and is entitled to recover damages in an amount to be proven at trial.

217. NRT has been and will continue to be irreparably harmed unless Defendants Tavolo and Object Studio's misconduct is enjoined.

HOWARD & HOWARD ATTORNEYS PLLC

**ELEVENTH CLAIM FOR RELIEF**

**(Civil Conspiracy—All Defendants)**

218. NRT repeats and incorporates by reference the allegations set forth in the foregoing paragraphs.

219. Defendants McClellan, Nagata, Object Studio, and Tavolo agreed—expressly or tacitly—to act in concert to accomplish an unlawful objective, including misappropriating the NRT Trade Secrets and interfering with NRT's contractual rights, or to achieve a business objective by unlawful means. Specifically, upon information and belief, the conspiracy was formed no later than December 2020 (and potentially earlier), when Defendant Nagata began working for Defendant Object Studio, which had completed its last engagement with NRT only nine months earlier.

220. Upon information and belief, McClellan coordinated with Nagata and Object Studio during this period, directing them to begin development of competing products using the NRT Confidential Information and the NRT Trade Secrets in anticipation of the formation of Tavolo.

221. The coordinated nature of Defendants' conduct is evidenced by the fact that each Defendant contributed a distinct and complementary role essential to the scheme: McClellan provided strategic direction and the foundational knowledge of the VL platform he had created; Nagata provided product management expertise and detailed knowledge of NRT's proprietary systems acquired as the executive responsible for the entire VL product line; Object Studio provided software development capability and direct access to the proprietary source code it had authored for NRT; and Tavolo was the commercial vehicle through which the fruits of the conspiracy were brought to market.

222. This division of labor and responsibility, combined with the overlapping timelines of Defendants' departures from NRT and their subsequent collaboration, demonstrates a coordinated agreement to exploit NRT's proprietary technology for the Defendants' mutual financial benefit and with the specific intent to harm NRT by enabling Tavolo to compete unfairly using NRT's own technology.

223. In furtherance of this agreement, Defendants committed overt acts, including:

a. Defendant McClellan's forming Defendant Tavolo to compete using the very information he sold and agreed never to use;

HOWARD & HOWARD ATTORNEYS PLLC

b. Defendant Object Studio's using and transferring Client Intellectual Property, NRT Confidential Information, and NRT Trade Secrets to Defendant Tavolo in violation of its PSA and NDA;

c. Defendant Nagata's disclosing and using NRT Confidential Information and NRT Trade Secrets after leaving NRT to assist Defendants Object Studio and Tavolo;

d. Defendants' developing and marketing the Tavolo Products, which replicate NRT's proprietary architecture and analytics; and

e. Each Defendant's acting with knowledge of the others' duties to NRT and intending to harm NRT by accelerating Defendant Tavolo's entry into the market using NRT's technology.

224. As a direct and proximate result of such conduct, NRT suffered and continues to suffer damages and other harm, including lost sales, unjust enrichment to Defendants, and harm to goodwill, in amounts to be proven at trial. Defendants are jointly and severally liable for all damages and for all torts committed in furtherance of the conspiracy.

225. NRT's civil conspiracy claim is based not only on Defendants' misappropriation of trade secrets but also, independently, on Defendants' coordinated interference with NRT's contractual relationships. Specifically, Defendants breached (or induced the breach of) the MIPA, the McClellan Employment Agreement, the Nagata Employment Agreement, the Object Studio PSA, and the Object Studio NDA—each of which imposed independent contractual duties beyond trade secret protection, including non-compete covenants, non-solicitation obligations, intellectual property assignment provisions, and restrictions on third-party use or transfer of client work product.

226. Defendants' conspiracy to breach these contractual obligations caused NRT independent harm—including loss of the competitive protection afforded by McClellan's and Nagata's non-compete covenants and loss of NRT's exclusive ownership of Object Studio's work product—that exists independently of any claim for trade secret misappropriation.

227. Defendants' conduct was willful and malicious, entitling NRT to the recovery of punitive damages.

228. NRT has been and will continue to be irreparably harmed unless Defendants'

HOWARD & HOWARD ATTORNEYS PLLC

conspiracy is enjoined.

**PRAYER FOR RELIEF**

WHEREFORE, NRT prays for judgment and relief against Defendants, jointly and severally, as follows:

A. For an order granting preliminary and/or permanent injunctive relief, enjoining Defendants and their officers, agents, employees, attorneys, and all persons acting in concert or participation with them from:

i. Using, disclosing, licensing, transferring, or otherwise exploiting any of NRT's Confidential Information or NRT Trade Secrets;

ii. Manufacturing, advertising, marketing, selling, or otherwise distributing the Tavolo Products or any other product or service derived from or embodying the NRT Confidential Information or NRT Trade Secrets; and

iii. Failing to return to NRT and/or certify the destruction of all documents, data, materials, and property—in any form whatsoever—that contain, reflect, or are derived from the NRT Confidential Information or NRT Trade Secrets;

iv. Competing with NRT, directly or indirectly, in the table game management systems market, including by owning, managing, operating, controlling, or participating in the ownership, management, operation, or control of, or providing any services or financial resources to, Defendant Tavolo or any other competing business, in violation of Defendants McClellan's and Nagata's non-compete covenants;

v. Soliciting, recruiting, or hiring any NRT employee, contractor, or consultant, or otherwise interfering with NRT's contractual relationships;

B. For an order requiring Defendants McClellan and Nagata to comply with their non-compete covenants for a period equal to the time during which they were in breach, or for such other equitable extension as the Court deems just, to ensure NRT receives the full benefit of the bargained-for restrictive periods;

C. For an award of NRT's actual damages arising from Defendants McClellan's and Nagata's breaches of their non-compete covenants, including lost profits, lost market share, lost

HOWARD & HOWARD ATTORNEYS PLLC

business opportunities, and any head start advantage obtained by Defendants as a result of their premature competitive activities during the restricted periods, in an amount to be proven at trial;

D. For an award of NRT's actual damages, including compensatory, consequential, and incidental damages, and for any unjust enrichment obtained by Defendants not accounted for in computing actual damages, or, in the alternative, for a reasonable royalty for Defendants' unauthorized disclosure, misappropriation, and/or use of the NRT Confidential Information and/or NRT Trade Secrets, in an amount to be proven at trial;

E. For an award of exemplary damages, up to two times the amount of any award made under the foregoing paragraph, under 18 U.S.C. § 1836(b)(3)(C) and Nev. Rev. Stat. § 600A.050(2), and for punitive damages on NRT's common law claims, based on Defendants' willful and malicious conduct;

F. For an accounting and disgorgement of all revenues, profits, and other proceeds derived by Defendants from the Tavolo Products and from any other products or services developed using NRT Confidential Information and/or NRT Trade Secrets;

G. For an award of NRT's reasonable attorneys' fees and costs incurred in this action, under at least 18 U.S.C. § 1836(b)(3)(D), Nev. Rev. Stat. § 600A.060, and as otherwise permitted by law or contract; and

H. For such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff NRT demands a trial by jury for all issues so triable.

Dated: this 2nd day of July 2026.

Respectfully submitted,

FBT GIBBONS LLP

By: /s/ John F. Bennett
John F. Bennett, Esq.
Will comply with LR IA 11-2 within 14 days
Paul J. Linden, Esq.
Will comply with LR IA 11-2 within 14 days
Aaron T. Brogdon, Esq.
Will comply with LR IA 11-2 within 14 days
Derek M. Freitas, Esq.
Will comply with LR IA 11-2 within 14 days
Nicholas R. Taylor, Esq.

Will comply with LR IA 11-2 within 14 days
Amy E. Mildebrath, Esq.
Will comply with LR IA 11-2 within 14 days
301 East Fourth Street, Suite 3300
Cincinnati, Ohio 45202
Telephone: (513) 651-6423
Email: jbennett@fbtgibbons.com
Email: plinden@fbtgibbons.com
Email: abrogdon@fbtgibbons.com
Email: dfreitas@fbtgibbons.com
Email: ntaylor@fbtgibbons.com
Email: amildebrath@fbtgibbons.com

HOWARD & HOWARD ATTORNEYS PLLC

By: /s/ Jonathan W. Fountain
W. West Allen, Esq.
Nevada Bar No. 5566
Jonathan W. Fountain, Esq.
Nevada Bar No. 10351
3800 Howard Hughes Pkwy, Suite 1000
Las Vegas, NV 89169
Telephone : (702) 257-1483
Email: wwa@h2law.com
Email: jwf@h2law.com

*Attorneys for Plaintiff, NRT Technologies, Inc.*